Leo E. FAYARD and Sara K. Fayard, Plaintiffs,

v.

NORTHEAST VEHICLE SERVICES, LLC, East Brookfield & Spencer Railroad, LLC, Holston Land Company, Inc., CSX Real Property, Inc., Steven M. Pugliese, and George W. Bell, II, Defendants.

No. CIV.A.07 40006 FDS.

United States District Court, D. Massachusetts.

June 13, 2007.

---

14. *Id.* at 766.

David A. Wojcik, Donald C. Keavany, Jr., Christopher, Hays, Wojcik & Mavricos, Worcester, MA, for Plaintiffs.

Elizabeth A. Daly, Michael T. Maroney, Ralph T. Lepore, III, Wendy E. Millette, Holland & Knight, LLP, Boston, MA, for Defendants.

### MEMORANDUM AND ORDER ON PLAINTIFFS' MOTION TO REMAND TO STATE COURT AND FOR ATTORNEY'S FEES

SAYLOR, District Judge.

This is an action seeking monetary and injunctive relief pursuant to state law

claims of nuisance, misrepresentation, and civil conspiracy. Plaintiffs Leo E. Fayard and Sara K. Fayard originally filed their complaint in the Worcester County Superior Court. Defendants subsequently removed the action to federal court pursuant to 28 U.S.C. § 1441(b), contending that plaintiffs' state law claims against defendant East Brookfield & Spencer Railroad, LLC are completely preempted by the Interstate Commerce Commission Termination Act ("ICCTA"), 49 U.S.C. § 10101 *et seq.*

Pending before the Court is plaintiffs' motion to remand the case to the Superior Court and for attorney's fees. For the reasons stated below, the motion will be denied.

## I. *Background*

### A. *Defendants' Proposed Commercial Project*

Plaintiffs Leo and Sara Fayard, husband and wife, have resided in East Brookfield, Massachusetts, since 1980. Their property consists of 17 acres of farmland and woodland and abuts the CSX (formerly Conrail) railroad line. According to the complaint, plaintiffs purchased the land in order to maintain a modest farm and to pursue a rural lifestyle.

In 1990, defendants George W. Bell, II and Steven M. Pugliese began planning a commercial project in the towns of East Brookfield and Spencer on 218 acres of land that they purchased as partners through the Seven Mile River Nominee Trust. During the planning process, Bell and Pugliese stated that 25% of the project was to consist of an automobile distribution/processing facility, in which newly-manufactured automobiles were to be brought in by rail cars, unloaded, and transported by truck to dealers. The other 75% was to be utilized for rail-oriented distribution, warehousing, light manufacturing, research and development, office

space, and a vocational school. The East Brookfield portion of the property, which was intended for commercial development, was within approximately 50 feet of plaintiffs' farm.

When Bell and Pugliese purchased the property in East Brookfield, it was zoned residential/agricultural. Defendants' first attempt to have the land rezoned to commercial was defeated at the East Brookfield Town Meeting on May 7, 1991. Defendants thereafter agreed to convey 14 acres of land to the Town and further agreed that a 60–acre parcel would be subject to restrictive covenants that prohibited the parcel from being used as a commercial freight yard. In exchange, the Town voted on April 6, 1992, to rezone the 60–acre parcel for commercial use.

### B. *Defendants' Representations Concerning the Project*

In 1992, Bell and Pugliese began the process of complying with the Massachusetts Environmental Policy Act ("MEPA"), Mass. Gen. Laws ch. 30, §§ 61–62H, and obtaining state and local permitting for the proposed project. Leo Fayard was on the distribution list for, and received, defendants' MEPA filings. According to the complaint, defendants made the following representations, among others, in those filings:

- Rail car shuttling and unloading, and the loading of automobiles onto truck transporters, would be restricted to normal business hours (7:00 a.m. to 5:00 p.m. Monday through Friday, and 7:00 a.m. to 1:00 p.m. on Saturday).

- Movement of the rail cars would be done by "shuttle wagon" as opposed to full-size locomotives.

- Use of shuttle wagons to move rail cars and truck-loading operations would be limited to normal business hours.

- The capacity of the facility at full operational levels would be 200,000 automobiles per year.
- An automobile distribution facility would only be a portion of the proposed project, which would also consist of warehousing, distribution, light assembly, research and development, office use, and a vocational training center, as well as other areas for fishing, canoeing, hiking, and other recreational activities.

Defendants further represented that they were "prepared to provide mitigation for the project effects as detailed in the report." (Compl.¶ 25).

In an affidavit, plaintiffs further allege that Bell made direct representations to them regarding the project. Specifically, plaintiffs allege that Bell stated that the hours of operation would be limited to daylight hours; that the impact of the project on plaintiffs' home would be minimal; that railroad activity would be more than 1,000 feet away from their property; that the freight yard for automobiles would be located on the Spencer portion of defendants' land; that rail cars would be spotted one half-mile from plaintiffs' home; that shuttle wagons would be used; and that the East Brookfield portion of the property would only be used for warehousing and processing buildings. Plaintiffs further allege that Bell promised to take whatever measures necessary to minimize the impact of the project on abutters.

## C. *Operation of the Facility*

On April 23, 2004, Bell and Pugliese conveyed their property to defendant Holston Land Company, Inc. Holston subsequently leased the property to defendant CSX Real Property, Inc. which continued to develop the facility and then subleased it to defendant Northeast Vehicle Services, LLC, pursuant to a vehicle services terminal agreement. According to the complaint, defendants Bell and Pugliese each own 25.5% of Northeast Vehicle Services. The complaint further indicates that Bell and Pugliese created East Brookfield and Spencer Railroad, LLC ("EB & SR") to provide rail services to the facility.

The facility opened on October 18, 2004. Plaintiffs allege that from the beginning defendants have failed to operate the facility in conformity with their earlier representations and have violated the restrictive covenants. Specifically, plaintiffs allege that (1) rather than having a capacity of 200,000 automobiles per year, the facility's actual capacity is in excess of 400,000 automobiles per year; (2) no buildings for office space, research and development, warehouse space, or vocational training have been built; (3) there are no suitable areas for fishing, canoeing, hiking, or other recreational activities; (4) the facility operates 24 hours per day, 7 days per week; (5) the facility uses full-size locomotives, not shuttle wagons; and (6) a commercial freight yard has been constructed on the East Brookfield portion of the property.

Plaintiffs further contend that they are subject to railroad noises 24 hours per day, 7 days per week; that constant diesel fumes invade their home and blanket their yard and farm; and that they are subject each night to bright lights, including both stationary lights and locomotive, truck, and automobile lights. They further contend that they have been denied the peaceful use and enjoyment of their home and lifestyle, and that they have lost sleep, become nervous and upset, and have been subjected to unhealthy and noxious diesel fumes.

## II. *Procedural History*

Plaintiffs filed the present action in the Worcester County Superior Court on December 14, 2006. The three-count complaint alleges state law claims of (1) nui-

sance; (2) misrepresentation; and (3) civil conspiracy. The complaint seeks both monetary damages and injunctive relief.

On January 4, 2007, defendants removed the action to this Court on federal question grounds, contending that plaintiffs' state law claims against defendant EB & SR are completely preempted by the ICCTA.[1] Plaintiffs moved to remand on January 30, contending that the doctrine of complete preemption is not applicable to this case, and that removal was therefore improper because each of the claims set forth in their complaint arises under Massachusetts state law.

### III. *Analysis*

#### A. *Motion to Remand*

■ A civil action filed in state court may be removed to federal court if the claim is one "arising under the Constitution, treaties or laws of the United States." 28 U.S.C. § 1441(b). To determine whether a claim arises under federal law, courts look to the "well-pleaded" allegations of the complaint, ignoring potential defenses. *See Aetna Health Inc. v. Davila,* 542 U.S. 200, 207, 124 S.Ct. 2488, 159 L.Ed.2d 312 (2004); *Beneficial Nat'l Bank v. Anderson,* 539 U.S. 1, 6, 123 S.Ct. 2058, 156 L.Ed.2d 1 (2003). As the Supreme Court has explained,

> whether a case is one arising under the Constitution or a law or treaty of the United States, in the sense of the jurisdictional statute[,] ... must be determined from what necessarily appears in the plaintiff's statement of his own claim in the bill or declaration, unaided by anything alleged in anticipation or avoid-

ance of defenses which it is thought the defendant may interpose.

*Taylor v. Anderson,* 234 U.S. 74, 75–76, 34 S.Ct. 724, 58 L.Ed. 1218 (1914).

■ Thus, the existence of a federal defense—including a defense that relies on the preemptive effect of a federal statute—"normally does not create statutory 'arising under' jurisdiction, and a defendant may not [generally] remove a case to federal court unless the *plaintiff's* complaint establishes that the case 'arises under' federal law." *Aetna Health,* 542 U.S. at 207, 124 S.Ct. 2488 (quotation and internal citations omitted) (emphasis in original); *see Beneficial,* 539 U.S. at 6, 123 S.Ct. 2058 ("[a]s a general rule, absent diversity jurisdiction, a case will not be removable if the complaint does not affirmatively allege a federal claim.").

#### 1. *Complete Preemption Doctrine*

■ There is an exception, however, to the well-pleaded complaint rule. " '[W]hen a federal statute wholly displaces the state-law cause of action through complete pre-emption,' the state claim can be removed." *Aetna Health,* 542 U.S. at 207, 124 S.Ct. 2488 (quoting *Beneficial,* 539 U.S. at 8, 123 S.Ct. 2058). In other words, "[w]hen the federal statute completely preempts the state-law cause of action, a claim which comes within the scope of that cause of action, even if pleaded in terms of state law, is in reality based on federal law. This claim is then removable under 28 U.S.C. § 1441(b)." *Beneficial,* 539 U.S. at 8, 123 S.Ct. 2058; *see also Metropolitan Life Ins. Co. v. Taylor,* 481 U.S. 58, 63–64, 107 S.Ct. 1542, 95 L.Ed.2d 55 (1987) ("One

---

1. Defendants' preemption arguments are limited to the claims against EB & SR and do not address the claims against the remaining defendants. However, when a removable claim is joined with one or more otherwise nonremovable claims, the entire case may be removed. 28 U.S.C. § 1441(c). Accordingly, for purposes of the present motion to remand, the Court need only determine whether the claims against EB & SR are subject to removal.

corollary of the well-pleaded complaint rule developed in the case law, however, is that Congress may so completely pre-empt a particular area that any civil complaint raising this select group of claims is necessarily federal in character.").

Prior to its 2003 decision in *Beneficial,* the Supreme Court had limited its application of the complete preemption doctrine to causes of action under the Labor Management Relations Act, 29 U.S.C. § 185 ("LMRA") and the Employee Retirement Income Security Act, 29 U.S.C. § 1132 ("ERISA"). In *Beneficial,* however, the Court expanded the doctrine's reach, finding that state law usury claims against a national bank are completely preempted by the National Bank Act, 12 U.S.C. §§ 85, 86. *Beneficial,* 539 U.S. at 11, 123 S.Ct. 2058. In so holding, the Court indicated that "the proper inquiry focuses on whether Congress intended the federal cause of action to be exclusive rather than on whether Congress intended that the cause of action be removable." *Id.* at 9 n. 5, 123 S.Ct. 2058. Courts have subsequently interpreted the *Beneficial* holding as extending the complete preemption doctrine "to any federal statute that both preempts state law and substitutes a federal remedy for that law, thereby creating an exclusive federal cause of action." *Briarpatch Ltd. v. Phoenix Pictures, Inc.,* 373 F.3d 296, 305 (2d Cir.2004).

### 2. Complete Preemption Doctrine Applied to Present Case

■ Defendants contend that plaintiffs' state law claims against defendant EB & SR constitute, in substance, an attempt to regulate the railroad's operations, and that the ICCTA completely preempts such claims, rendering them removable to federal court. Given the nature of the relief sought by plaintiffs—which includes limiting the railroad's hours of operation and enjoining the railroad from operating in a manner that causes noises, fumes, or vibrations to affect the plaintiffs' property—the Court agrees that plaintiffs' claims seek to regulate the railroad's operations. Accordingly, the issue is whether the ICCTA completely preempts such claims. Specifically, the Court must determine (1) whether Congress intended that the ICCTA provide the exclusive cause of action for claims seeking to regulate railroad operations, and (2) whether the ICCTA sets forth procedures and remedies governing that cause of action. *See Beneficial,* 539 U.S. at 8, 123 S.Ct. 2058 ("In the two categories of cases where this Court has found complete pre-emption . . . the federal statutes at issue provided the exclusive cause of action for the claim asserted and also set forth procedures and remedies governing that cause of action."); *see also Singh v. North Am. Airlines,* 426 F.Supp.2d 38, 43 (E.D.N.Y.2006). The Court answers both questions in the affirmative.

### a. Whether Congress Intended That the ICCTA Provide the Exclusive Cause of Action for Claims Seeking to Regulate a Railroad's Operations

■ As the Supreme Court noted in *Beneficial,* the primary focus of the complete preemption analysis is on "whether Congress intended the federal cause of action to be exclusive." *Beneficial,* 539 U.S. at 9 n. 5, 123 S.Ct. 2058. The Court will therefore turn its attention to the text of the ICCTA.

The place to start, of course, is with the language of the statute. The ICCTA states as follows:

> Except as otherwise provided in this part, the remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law.

49 U.S.C. § 10501(b). It therefore appears obvious from the face of the statute that Congress intended the remedies set forth in the ICCTA to be exclusive, and further intended those remedies to preempt state law claims touching on the subject of railroad regulation.

The case law strongly supports this reading of the statute. *See, e.g., Pejepscot Indus. Park, Inc. v. Maine Cent. R.R.,* 215 F.3d 195, 202, 204–05 (1st Cir.2000) ("The last sentence of § 10501(b) plainly preempts state law;" and "[t]he thrust of the [ICCTA] is to federalize these disputes . . . ."); *Grafton & Upton R.R. v. Town of Milford,* 337 F.Supp.2d 233, 238 (D.Mass. 2004) ("The statutory language indicates an express intent on the part of Congress to preempt the entire field of railroad regulation, including activities related to but not directly involving railroad transportation."); *Engelhard Corp. v. Springfield Terminal Ry.,* 193 F.Supp.2d 385, 389 (D.Mass.2002) ("The concluding sentence of section 10501(b) is an unmistakable statement of Congress's intent to preempt state laws touching on the substantive aspects of rail transportation."); *CSX Transp., Inc. v. Georgia Pub. Serv. Comm'n,* 944 F.Supp. 1573, 1581 (N.D.Ga. 1996) ("It is difficult to imagine a broader statement of Congress's intent to preempt state regulatory authority over railroad operations."); *Cedarapids, Inc. v. Chicago, Cent. & Pac. R.R. Co.,* 265 F.Supp.2d 1005, 1013 (N.D.Iowa 2003) ("[I]n enacting the ICCTA, Congress intended to occupy completely the field of state economic regulation of railroads.").

Plaintiffs, however, contend that the ICCTA does not completely preempt *all* regulations that affect railroads, but rather only those that interfere with interstate rail operations. *See Allied Erecting & Dismantling Co. v. Ohio Cent. R.R., Inc.,* No. 4:06CV509, 2006 WL 2933950, at *3 (N.D.Ohio Oct. 12, 2006) (citing *TOWNSHIP OF WOODBRIDGE V. CONSOLI-*

*DATED RAIL CORP.,* STB Dkt. No. 42053, 2000 WL 1771044, at *3 (S.T.B. Nov. 28, 2000)). They further contend that voluntary commitments and agreements by railroads "must be seen as reflecting the carrier's own determination and admission that the agreements would not unreasonably interfere with interstate commerce." *TOWNSHIP OF WOODBRIDGE,* 2000 WL 1771044, at *3. Finally, plaintiffs argue that in the present case, their claims against EB & SR do not come within the ICCTA's scope, because they "seek no relief of any nature, for anything except the failure of the defendants to act in accord with their voluntary agreements and commitments." (Pl.'s Mot. Remand at 13). Specifically, plaintiffs state in their motion to remand that they "are willing to stipulate that they seek no injunctive relief beyond the voluntary agreements and commitments set forth by the defendants in the MEPA filings, the Restrictive Covenant with the Town of East Brookfield and the commitments and agreements made by Bell and Pugliese to Mr. & Mrs. Fayard." (Pl.'s Mot. Remand at 14 n. 10).

■ However, even assuming that Congress intended the ICCTA to be the exclusive cause of action only as to those claims that interfere with interstate railroad operations, and that enforcing a railroad's voluntary agreements and commitments cannot be seen as interfering with such operations, plaintiffs' claims would nonetheless fall under the ICCTA's preemptive scope. In determining whether the claims were properly removable, the Court must examine "the face of the complaint as it stood at the time the petition for removal was filed." *Ching v. Mitre Corp.,* 921 F.2d 11, 13 (1st Cir.1990) (citing *Westmoreland Hosp. Ass'n v. Blue Cross,* 605 F.2d 119, 123 (3d Cir.1979)). The First Circuit has indicated that "[a]n amendment to a complaint *after removal* designed to eliminate

the federal claim will not defeat federal jurisdiction." *Ching*, 921 F.2d at 13 (emphasis in original). Here, plaintiffs' attempt to narrow their requested relief through the stipulation in their motion remand is to no avail. The claims contained on the face of their complaint at the time of removal were not so limited. Rather, the complaint requests broad injunctive relief, seeking to enjoin the railroad "from operating the commercial freight yard in a manner which causes noises, fumes, or vibrations to affect the property of the plaintiffs, Mr. & Mrs. Fayard, or which affects their use and enjoyment of their property." (Compl. at 21). Such a far-reaching injunction would certainly have the potential to interfere with interstate commerce and rail transportation. *See Rushing v. Kansas City S. Ry. Co.*, 194 F.Supp.2d 493, 499 (S.D.Miss.2001) (holding that plaintiff's claims under state negligence and nuisance laws would "impose regulations on the [rail carrier] regarding the manner in which it operates its switch yard thereby potentially interfering with interstate rail operations"). Accordingly, the Court is satisfied that Congress intended the ICCTA to provide the exclusive cause of action for claims such as these, which are directly targeted at the operations of a railroad.

### b. *Whether Congress Has Set Forth Remedies and Procedures Governing the Exclusive Cause of Action*

The Court must next determine whether the ICCTA satisfies the second prong of the *Beneficial* analysis—that is, whether the statute sets forth procedures and remedies governing the exclusive cause of action provided therein. *See Singh*, 426 F.Supp.2d at 43. In the Court's view, the ICCTA is a comprehensive regulatory scheme that easily meets this standard. The ICCTA not only sets forth procedures governing the Surface Transportation Board's regulation of rail carriers, but also provides remedies for violations of Board orders and the statute itself. *See* 49 U.S.C. § 11704(a) (providing civil cause of action for enforcement of Board order); 49 U.S.C. § 11704(c)(1) (allowing person to file complaint with Board or bring civil cause of action for violation of ICCTA). It therefore appears that the ICCTA completely preempts plaintiffs' claims.

Plaintiffs contend, however, that complete preemption is inapplicable because "there is no federal cause of action that replaces the plaintiffs' state causes of action for nuisance, misrepresentation and civil conspiracy." (Pl.'s Mot. Remand at 10). In other words, plaintiffs believe that the complete preemption doctrine's applicability to this case rests on whether the ICCTA provides federal remedies equivalent to the specific state law claims asserted in the complaint. That position, however, is without merit.

■ It is true that plaintiffs' state law claims for nuisance, misrepresentation, and civil conspiracy are not available under the ICCTA's remedial provisions. Nonetheless, courts have indicated that "complete preemption can exist even where a particular plaintiff seeks a remedy that Congress chose not to provide when it effected complete preemption." *Rogers v. Tyson Foods, Inc.*, 308 F.3d 785, 789 (7th Cir. 2002); *see also Aetna Health*, 542 U.S. at 216, 124 S.Ct. 2488; *CSX Transp.*, 944 F.Supp. at 1581. Indeed, it would be highly anomalous if Congress intended both to preempt state regulation of railroad operations and permit private litigants to use state courts to regulate the hours and methods of operation of railroad facilities. "The policy choices reflected in the inclusion of certain remedies and the exclusion of others under the federal scheme would be completely undermined" under such circumstances. *Rogers*, 308 F.3d at 790 (quoting *Lister v. Stark*, 890 F.2d 941, 946

(7th Cir.1989)); *see also Aetna Health*, 542 U.S. at 216, 124 S.Ct. 2488. As the Seventh Circuit has noted:

> [a] federal cause of action need not provide the same remedies as the preempted state cause of action. The chance that the "nature of relief" available under federal law might be different from that under state law does not affect the jurisdictional analysis.

*Rogers*, 308 F.3d at 790 (quotation and internal citations omitted). Accordingly, the Court holds that the ICCTA sets forth procedures and remedies sufficient to satisfy the second prong of the *Beneficial* analysis, notwithstanding Congress's decision to exclude the particular remedies that plaintiffs now seek.

\*   \*   \*   \*   \*   \*

In summary, the Court concludes that (1) Congress intended the ICCTA to provide the exclusive cause of action for claims that seek to regulate railroad operations, and (2) the ICCTA sets forth procedures and remedies governing that cause of action. Because plaintiffs' state law claims against EB & SR fall within the scope of the ICCTA, those claims are completely preempted and therefore removable to federal court.

The Court further concludes that plaintiffs' arguments against complete preemption are without merit. First, even assuming (1) that the ICCTA only preempts those claims which interfere with interstate rail operations and (2) that voluntary agreements and commitments entered into by the railroad cannot be seen as constituting such interference, the claims at issue in this case would nonetheless fall within the ICCTA's preemptive scope. Plaintiffs' claims, as they existed on the face of the complaint at the time of removal, seek broad injunctive relief and threaten to interfere with interstate rail transportation. Second, the fact that the ICCTA's remedial scheme does not include the specific remedies sought by plaintiffs in this case does not bar the application of the complete preemption doctrine.

The Court finds that defendants properly removed this case to federal court, and plaintiffs' motion to remand will accordingly be denied.

### B.   *Motion for Attorney's Fees*

In order to award attorney's fees under the removal statute, the Court must conclude both that removal is improper because the Court lacks subject matter jurisdiction; and that the removing party lacked an objectively reasonable basis for seeking removal. *See* 28 U.S.C. § 1447(c); *Martin v. Franklin Capital Corp.*, 546 U.S. 132, 126 S.Ct. 704, 163 L.Ed.2d 547 (2005). In light of the Court's conclusion that removal was appropriate in this case, plaintiffs' motion for attorney's fees will be denied.

### IV.   *Conclusion*

For the reasons set forth above, plaintiffs' motion to remand to state court and for attorney's fees is DENIED.

**So Ordered.**